

speed ratios comprising shiftable elements, a clutch pedal, means for mechanically connecting said pedal to said elements to shift them, and a selector mechanism that is operative, irrespective of the position of said clutch pedal in its path of travel, to preselect any desired subsequent speed ratio."

"36. In a motor vehicle, a variable-speed transmission mechanism having an element shiftable into and out of operative position, actuating means for said element, and means operable independently of the position of said element to dispose said actuating means and thereby selectively control the direction of actuation of said member."

The references upon which the rejections were based are:

Beemer, 925,270, June 15, 1909.

Noble, British, 2,642, February 9, 1905.

Gower, British, 23,771, October 25, 1907.

Duverger, French, 7,776, August 12, 1907.

Duverger, French, 360,217, April 17, 1906.

The contentions presented on behalf of the appellant were carefully considered by the examiner, the examiners in chief, and the Commissioner, and in so far as the appealed claims are concerned they were unanimous in the view that the claims were anticipated by the cited references. We have compared the claims with the references and are convinced that the decisions of the lower tribunals were correct. We do not find it necessary to repeat the grounds for these conclusions, which are sufficiently set out in the decisions.

The decision of the Commissioner of Patents is affirmed.

### In re BUTZ.

Court of Appeals of District of Columbia.

Submitted January 14, 1929. Decided February 4, 1929.

No. 2094.

William A. Smith, Jr., of Washington, D. C., for appellant.

T. A. Hostetler, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a decision of the Patent Office rejecting claims 1 to 5, inclusive, relating to the method of making fashioned stockings from a seamless tubular web. Claims 1 and 5 are here reproduced:

"1. The method of manufacturing hosiery, which consists in forming a stocking as a seamless tubular web, placing the seamless stocking upon a board adapted to maintain the fabric free from wrinkles, outlining upon the fabric a predetermined configuration, cutting the fabric to said outline, and joining the fabric at the severed edges to complete the stocking."

"5. The method of forming fashioned hosiery, which consists in taking a seamless stocking, boarding the stocking, laying a second board of predetermined configuration against the first with front edges of the boards corresponding, cutting the fabric of the stocking to the outline of the rear edge of the said second board, and joining the fabric at the severed edges to complete the stocking."

Appellant forms a seamless stocking in the usual manner by a circular knitting machine. Stockings of this type do not closely fit the leg.

The patent to Ellis (1,220,209, March 27, 1917) discloses a method of forming fashioned hosiery consisting in "forming a tube of fabric, flattening the fabric, then while the tube is laid flat, cutting it on a line to shape the same in conformity with the rear of the leg, ankle," etc. After thus cutting and sewing the stocking, Ellis uses a stocking board while the stocking is subjected to a shrinking process, thereby causing the stocking to assume the shape of the board. In other words, Ellis does not disclose the use of a stocking board until after the stocking has been cut and seamed.

Appellant first places the comparatively shapeless, tubular, seamless, stocking upon a stocking board. He then lays "a second board of predetermined configuration against

the first with front edges of the boards corresponding;" and then cuts the fabric of the stocking to the outline of the rear edge of the second board. The severed edges of the stocking are then joined and the operation is completed. By this method uniformity of product is assured; that is, every stocking of any definite lot will be given the same outline or configuration. Obviously, this would not be possible under the Ellis method. The Board of Appeals recognized this by allowing claim 6, which contains an additional limitation, consisting of "means for properly positioning the stocking on a form board"; the means, as described in the specification, being "a line of drop stitches extending down the back center line of the stocking and under the foot to the toe."

We think the most important element of the claims consists in the provision for boarding the stocking prior to marking it, and that therefore claim 5 should be allowed.

The decision is affirmed as to claims 1 to 4, inclusive, and reversed as to claim 5.

Affirmed as to claims 1 to 4, inclusive.

Reversed as to claim 5.

## In re TRATTNER.

Court of Appeals of District of Columbia.

Submitted January 14, 1929. Decided February 4, 1929.

No. 2098.

W. H. Finckel, Jr., of Washington, D. C., for appellant.

T. A. Hostetler, of Washington, D. C., for Board of Appeals.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

MARTIN, Chief Justice. The appellant applied for letters patent for an alleged invention relating to remedial agencies, more especially for the treatment of diseases of the lungs, as for instance tuberculosis and like ailments.

The remedy consists of grated horse-radish boiled in honey to the consistency of a jelly, which is to be taken cold by the patient with "Balm of Gilead" as a tea. The patient should take two or three tablespoonfuls about midway between meals. The applicant states that the composition "aids to thicken the blood; relieves the anaemic condition; builds up the system; throws off disease, and heals the lungs rapidly, accomplishing this in two or three months if taken regularly."

The applicant's claim was rejected by the examiner, whose decision was affirmed by the Board of Appeals, whereupon the present appeal was taken.

It appears that the American Dispensatory, in discussing horse-radish on page 271, says: "The grated root with sugar to form a syrup with water, is excellent for hoarseness; a spoonful or two may be swallowed as occasion requires."

The same authority, on page 520, treats of the medicinal value of honey as follows: "A very excellent preparation for coughs, especially during febrile or inflammatory attacks, is composed of honey, olive oil, lemon juice, and sweet spirits of niter, each one fluid ounce, to be taken several times a day in half-fluidrachm or fluidrachm doses."

The same publication discourses upon the medicinal value of Balm of Gilead, and on page 664 says: "The Buds of the Populus Candicans, or Balm of Gilead, possess similar virtues to the above. * * * Populus buds are reputed stimulant, tonic, diuretic, and antiscorbutic. A tincture of them has been beneficially employed in affections of the chest, stomach, and kidneys, and in rheumatism and scurvy. * * * Dose of a tincture of the buds, from one to four fluidrachms, which is excellent for colds and pain in the chest."

In Foster's Medical Dictionary, p. 338, it is said concerning the medical value of horse-radish: "It is used as a condiment and medicinally as a remedy in scurvy, as a stomachic tonic, and, both externally and internally, in paretic conditions and chronic rheumatism. * * * A mixture of 1 part of the juice of wild horse-radish root and 4 parts of honey."

The record does not show that the combinations set out by appellant result in any new chemical composition, and it is fair to